IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

ADA PELT-WASHINGTON,

       Plaintiff,

v.                                      CASE NO. 1:05-cv-00163-MP-AK

FRESENIUS MEDICAL CARE AG,
FMC HOLDINGS INC.,
d/b/a BMA STARKE,

       Defendants.

_____/

## O R D E R

This matter is before the Court on Doc. 42, Motion for Summary Judgment, filed by Defendants.  Plaintiff has filed a Response in Opposition to Defendants' Motion for Summary Judgment, Doc. 48.  Defendants move to strike this response as not in compliance with Local Rule 7.1(C)(1), which limits a responsive memorandum to twenty-five pages, absent good cause shown and prior order of the Court.  Because Plaintiff's response is in excess of the page limit, and because Plaintiff did not seek prior approval from the Court to exceed the page limit, Defendants' motion to strike is granted, and Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment, Doc. 48, is hereby stricken from the record.  Plaintiff has also filed an Amended Response in Opposition to Defendants' Motion for Summary Judgment, Doc. 51, which is in compliance with Local Rule 7.1(C)(1), and which the Court will consider.

Plaintiff brings suit pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e) *et seq.*, ("Title VII"), alleging that the Defendants discriminated against her on the basis of her race and religion by failing to promote her, by paying her less than similarly situated employees outside the protected class, by creating a hostile work environment, and by

constructively discharging her because of this hostile work environment.   For the following

reasons, Defendants' Motion for Summary Judgment is granted.

## I. Factual Background

The following facts are undisputed, except as otherwise noted.  Defendant Fresenius

Medical Care AG ("Fersenius") operates outpatient dialysis clinics throughout the United States,

including the facility located in Starke, Florida, where Plaintiff was employed.  Plaintiff

Washington, an African-American woman, was hired as a Patient Care Technician ("PCT") on

February 6, 1996, and continued to work as a PCT until her resignation on March 8, 2002.

During her employment as a PCT, Plaintiff provided direct patient care for dialysis patients with

end-stage renal disease under the direct supervision of a licensed nurse.  This included

connecting and disconnecting patients undergoing dialysis for renal failure to kidney dialysis

machines, canulating patients (inserting a dialysis needle into the patient's vein), operating all

dialysis-related equipment, documenting information related to patient treatment, and assisting

and responding to emergency situations related to dialysis treatment.

Plaintiff alleges that throughout her employment at Fersenius she was subjected to overt

racial and religious discrimination by patients and co-workers.  The specific incident prompting

Plaintiff's resignation arose in December 2001,when Plaintiff informed Defendants' Area

Manager, Carol McNamara, that a patient had directed a racial slur at her.  Plaintiff then began to

complain that she felt chest pains, and was transported to the hospital.  Plaintiff was released

from the hospital the next day, and on January 17, 2002, she requested leave based on stress in

accordance with the Family and Medical Leave Act.  Plaintiff was scheduled to return to work

on February 11, 2002, and she requested that Defendant Fresenius assist her by not assigning her

to the patient who had used the racial slur or to two other patients, by no longer scheduling her to open or close the facility, and by having Defendant Fresenius post its policy against discrimination in the patient waiting room.  Defendant Fresenius implemented these requests by the time Plaintiff returned to work.  On March 8, 2002, Plaintiff resigned as a PCT with Fresenius without stating a reason for the resignation.

On April 23, 2002, Plaintiff filed a Charge of Discrimination with the Florida Commission on Human Relations and the Equal Employment Opportunity Commission, alleging discrimination and retaliation on the basis of race and religion, in violation of Title VII.  After the Charge of Discrimination was dismissed, Plaintiff filed the instant action, alleging that Defendants discriminated against her based upon her race and religion, created a hostile work environment because of her race and religion, and constructively discharged her by creating a hostile work environment, all in violation of Title VII.

## II.  Legal Standard

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED.R.CIV.P. 56(c).  In determining the existence of a genuine issue of material fact, the Court views the facts in a light favorable to the non-moving party, with the moving party bearing the burden of demonstrating the lack of a genuine issue.  If the movant successfully discharges this burden, the burden then shifts to the non-movant to establish, by going beyond the pleadings, the existence of a genuine issue of material fact.  Matsushita Electric Industrial Co. v. Zenith Radio Corp. 475 U.S. 574,

586-87, 106 S.Ct. 1348, 1355-56, 89 L.Ed.2d 538 (1986); Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir.1991).  An issue of material fact is genuine if the evidence in the record would allow a reasonable jury to return a verdict for the non-moving party.  Anderson v. Liberty Lobby Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2510-11, 91 L.Ed. 2D 202 (1986).  If a non-moving party bears the burden of proof at trial, the moving party is entitled to summary judgment by showing that the non-moving party cannot prove an essential element of their cause of action through the admissible evidence in the record.  As explained by the Supreme Court for the United States:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).  The purpose of the Court in deciding a summary judgment motion is not to decide issues of material fact, but rather to determine whether such issues exist to be tried.

### *Title VII*

Under Title VII, it is an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  In her complaint, Plaintiff Washington alleges that Defendants intentionally discriminated against her based on her race and religion through disparate pay, failure to promote, hostile work

environment, and constructive discharge.  Plaintiff ultimately bears the burden under Title VII

to prove that race or religion was a determining factor in Defendants' employment decision, and

she initially bears the burden of establishing a prima facie case of such discrimination.  "The

complainant in a Title VII trial must carry the initial burden under the statute of establishing a

prima facie case of racial discrimination."   McDonnell Douglas Corp. v. Green, 411 U.S. 792,

93 S.Ct. 1817, 36 L.Ed2d 668 (1973).  A "prima facie case" in the Title VII context is a legally

mandatory, rebuttable presumption that can be established either through direct evidence of

discrimination or through circumstantial evidence.

    In the absence of direct evidence of discrimination, the Court applies the McDonnell

Douglas burden-shifting framework to Title VII discrimination claims.  See Brooks v. County

Comm'n of Jefferson County, 446 F. 3d 1160, 1162 (11th Cir. 2006).  In this case, Plaintiff has

not provided any direct evidence that her employer discriminated against her on the basis of her

race or religion.  Direct evidence "is composed of only the most blatant remarks, whose intent

could be nothing other than to discriminate on the basis of some impermissible factor."

Schoenfeld v. Babbitt, 168 F.3d 1257, 1266 (11th Cir.1999)(citation and internal quotation

marks omitted).  All of Plaintiff's evidence relates to comments made by fellow employees or

patients.  Because the allegedly racist remarks were not made by decision-makers with respect to

any employment decision, there is no direct evidence of a discriminatory motive.  See Price

Waterhouse v. Hopkins, 490 U.S. 228, 277, 109 S.Ct. 1775, 1804-05, 104 L.Ed.2d 268

(1989)(O'Connor, J., concurring)("Thus, stray remarks in the workplace . . . cannot justify

requiring the employer to prove that its hiring or promotion decisions were based on legitimate

criteria. Nor can statements by nondecisionmakers . . . .").  Therefore, the Court will consider

Plaintiff's claims under the McDonnell Douglas framework.

### A. Racial Discrimination - Failure to Promote

The four-pronged McDonnell Douglas test allows a plaintiff to establish a prima facie case under Title VII with circumstantial evidence.  To establish a prima facie case for failure to promote, a plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified and applied for a promotion; (3) she was rejected despite her qualifications; and (4) other equally or less qualified employees who were not members of the class were promoted. Wilson v. B/E Aerospace, Inc., 376 F.3d 1079 (11th Cir. 2004).  The establishment of a prima facie case creates a presumption that the employer unlawfully discriminated against the employee.  "If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case. "  Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094 , 67 L.Ed.2d 207 (1981).

If a plaintiff meets the burden of production, the burden then shifts to the defendant to rebut the presumption of discrimination by producing admissible evidence that the plaintiff was not promoted for a legitimate, nondiscriminatory reason.  The legally mandatory inference of discrimination drops from the case if a defendant's reason for the failure to promote is legally sufficient to justify a judgment for the defendant.  In order to meet the ultimate burden of persuasion, at this point the plaintiff must demonstrate that the defendant's proffered reason was not the true reason for the employment decision, but rather a pretext for the discriminatory reason.  A plaintiff may demonstrate pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the

employer's proffered explanation is unworthy of credence." <u>Burdine</u>, 450 U.S. at 256.  Bearing the burden of establishing pretext, a plaintiff must present significantly probative evidence on the issue to avoid summary judgment.  It is not enough that a plaintiff merely disagrees with the wisdom of the employer's reasons for the failure to promote, and unsupported assertions cannot constitute evidence of pretext.  <u>See</u> <u>Standard v. A.B.E.L. Servs., Inc.</u>, 161 F.3d 1318, 1332 (11th Cir. 1998).

Plaintiff states that she has established a prima facie case because she is a member of a protected class, applied and was qualified to be a Reuse Technician or a Transplant Coordinator, Defendants rejected her from these positions, and the positions were filled by members outside the protected class.  In the Motion for Summary Judgment, Defendants argue that because these jobs are not promotions, but are actually demotions, they cannot form the basis of a failure-to-promote claim.  Defendants point out that a Reuse Technician is a position that pays less than the PCT position held by Plaintiff, and that a Transplant Coordinator is not a separate position, but is instead a clerical task without any additional compensation given to employees to prepare paperwork for patients who wish to be placed on a kidney transplant list.  Defendants argue that Plaintiff could have been promoted only to a Licensed Practical Nurse or a Registered Nurse, and because Plaintiff was not qualified for either position and did not apply for them, her failure-to-promote claim must fail as a matter of law.

Plaintiff responds that because the Reuse Technician position included a pay increase when she applied for it, it should technically be considered a promotion.  The affidavit of Kimberly Justus, who during the relevant date was the Director of Nursing for Defendants, states that for "a short period of time, Fresenius had a shortage of Reuse Technicians.  As a result,

PCTs were given an opportunity to learn and perform Reuse Technician tasks and receive a small increase in pay." Doc. 42, Ex. F at 3. Plaintiff states that she requested this opportunity, but that two other PCTs were eventually given this position.

Generally, promotions involve a change in position entailing upward mobility to a job of higher pay or status. This did not occur in this case, because there was no job movement–only an increase in pay offered to PCTs for taking on additional duties. Plaintiff analogizes the situation to cases where the failure to transfer an employee to a new position based on discriminatory motives can constitute an adverse employment action if the new position entails an increase in pay, prestige, or responsibility. Because the Reuse Technician position also entailed an increase in pay and responsibility, Plaintiff argues that it satisfies the requirement for a "promotion." In this case, there is no "new" position. Instead, it is more closely analogous to over-time pay, which requires employees who work hours above and beyond that expected of them to be paid additional compensation. While Plaintiff could have been paid more if she had been selected to learn and perform Reuse Technician tasks, this would merely be in addition to her duties as a PCT. Considering the temporary nature of the situation, the additional duties could not be considered a promotion, just as relief from the additional duties after the shortage of Reuse Technicians ended could not be considered a demotion. Because Plaintiff has not shown that she applied for a "promotion," Plaintiff has failed to establish a prima facie case under Title VII for racial discrimination based on failure to promote.

Moreover, even if the additional duties were considered promotions, and Plaintiff could establish a prima facie case, Defendants have presented a valid, race-neutral reason for their decision. Because of a temporary shortage of Reuse Technicians, PCTs were used to fill the gap.

The PCTs who were selected, like Michael Bowen, had prior experience as Reuse Technicians, and therefore could provide services immediately without requiring extensive training. Given the nature of the situation, it was a perfectly rational, race-neutral decision to allow employees who had previous experience to perform Reuse Technician duties. Plaintiff has failed to show that this reason is pretextual. Furthermore, because Plaintiff is not similarly situated with these employees, she has failed to establish a prima facie case in this regards, and summary judgment is granted on this count.

### B. Racial and Religious Discrimination - Hostile Work Environment

Title VII's prohibition against discrimination in the "terms, conditions, or privileges of employment" includes discrimination through a work environment "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). The Supreme Court has held that conduct that is merely offensive is not enough to establish a Title VII violation, and that the conduct in question must objectively and subjectively create a discriminatorily abusive work environment to implicate Title VII. "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment–an environment that a reasonable person would find hostile or abusive–is beyond Title VII's purview." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21-22, 114 S.Ct. 367, 370, (1993). An environment is discriminatorily abusive or hostile "[w]hen the workplace is permeated with discriminatory intimidation, ridicule and insult and that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Id.

Absent direct evidence of discrimination, the same burden-shifting analysis of the

McDonnell Douglas test applies to hostile work environment claims.  To establish a prima facie

case of hostile work environment based on race or religion, a plaintiff must show that: (1) she is

a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the

harassment was based on her race or religion; (4) the workplace is permeated with

discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the terms

or conditions of employment and to create an abusive working environment; and (5) the

employer is responsible for such environment under either a theory of vicarious or of direct

liability.  Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir.2002).  To satisfy

the fourth element, a plaintiff must prove that: (1) she subjectively perceived the conduct to be

abusive, and (2) a reasonable person would find the conduct at issue objectively hostile or

abusive.  Id., at 1276.

Courts look at the totality of the circumstances in determining whether the conduct at

issue is objectively hostile or abusive.  Factors in the analysis include: "(1) the frequency of the

conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or

humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes

with the employee's job performance."  Mendoza v. Borden, Inc., 195 F.3d 1238, 1246 (11th

Cir.1999) (en banc).  These factors taken together must reveal conduct extreme enough to

"amount to a change in terms and conditions of employment." Faragher v. City of Boca Raton,

524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

i. Religion-Based Hostile Work Environment

During her six-year employment with Fersenius, Plaintiff lists only three incidents of

harassment directly based on her religion.  First, Plaintiff alleges that in October 2001, a fellow PCT, Melissa Turenne, told Plaintiff that she would be fired if she continued talking to her patients about her religion.  Next, Plaintiff states that she would pray with patients when they asked her to, and this led to ridicule from other employees.   Finally, Plaintiff quotes a fellow PCT as allegedly saying, "Oh, Ada, you think you're such a Christian. You're not."  Doc. 42, Ex E part 4 at 256.  In her affidavit, Carol McNamara, who worked for Defendants as the Area Administrator of the Starke facility during Plaintiff's employment, states that she was never aware of Plaintiff ever complaining about being discriminated against based on her religion, or of any complaints about Plaintiff being intolerant of others' religious views.

Taken together, these allegations certainly do not rise to the level frequent, severe, or pervasive abuse to establish a claim of hostile work environment based on religion. Furthermore, Plaintiff has failed to show that Defendants knew or should have known of this harassment.  Therefore, because Plaintiff cannot establish a prima facie case on this claim, the Motion for Summary Judgment is granted on the claim of hostile work environment based on religion.

ii.  Race-Based Hostile Work Environment

As a threshold matter, Defendants argue that because many of Plaintiff's allegations occurred more than three hundred days prior to the filing of her Charge of Discrimination, Plaintiff is time-barred from complaining about those events.  The requirement of timely filing a charge with the Equal Employment Opportunity Commission is not jurisdictional; rather, it is a statutory limitation that is subject to equitable tolling.  The limitations period is tolled "until the facts which would support a cause of action are apparent or should be apparent to a person with a

reasonably prudent regard for [her] rights." <u>Cocke v. Merrill Lynch & Co.</u>, 817 F.2d 1559 (11th Cir.1987).

Furthermore, the Supreme Court has distinguished unlawful employment practices that are inherently discrete claims, such as failure to hire or promote, from multiple incidents that are part of one collective unlawful employment practice, such as a hostile work environment claim.

> A hostile work environment claim is composed of a series of separate acts that collectively constitute one "unlawful employment practice." 42 U.S.C. § 2000e-5(e)(1). The timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened. It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.

<u>National R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 116, 122 S.Ct. 2061, 2074 (2002). Because at least one act contributing to the claim occurred within the filing period, all of Plaintiff's allegations over the six-year period are relevant in evaluating the hostile work environment claim, irrespective of when they occurred.  Therefore, when Plaintiff filed her Charge of Discrimination with the Equal Employment Opportunity Commission on April 23, 2002, less than one month after resigning, it was timely as to her race-based hostile work environment claim.

In her complaint, Plaintiff cites the following incidents as proof of a hostile work environment based on race:

> a.    Employees allegedly commented that Plaintiff's husband was a drug dealer by calling him "Mr. Big" because Plaintiff had purchased a Suburban;
> b.    An employee allegedly asked Plaintiff to identify the difference between her hair and her pubic hair;
> c.    An employee allegedly asked Plaintiff why she wore her hair a certain way;
> d.    Plaintiff's supervisor allegedly told her not to speak during staff meetings because the supervisor did not want to hear what she had to say;

e.      On two separate occasions when Plaintiff brought in food for workplace pot luck lunches, no one allegedly ate her food;

f.      Plaintiff allegedly did not receive assistance when she requested it, and Plaintiff was often left alone on the floor;

g.      An employee allegedly did not invite Plaintiff to her housewarming party;

h.      A patient, who allegedly gave other PCTs gifts, did not give one to Plaintiff, and the PCTs failed to share the gifts as required by policy;

i.      Two patients allegedly commented that they did not "want niggers touching" them;

j.      A patient's daughter said that she did not want Plaintiff touching her mother because Plaintiff  was a "nigger;"

k.      Plaintiff allegedly found a folded piece of paper lying face down on the floor of the patient waiting room, entitled, "Why Blacks are Inferior;"

l.      A patient's family member allegedly threatened Plaintiff and called her "chicken shit;"

m.      Plaintiff would be ridiculed by supervisors and PCTs whenever she made a mistake or a patient complained about a painful canulation;

n.      White nurses and PCTs were permitted to leave the premises while on the clock, while Plaintiff was not permitted to leave ;

o.      During her employment, Plaintiff heard employees making bigoted remarks about her to other employees and patients, and heard patients and employees use the word "nigger" in reference to her;

p.      Employees suggested that Plaintiff had twelve children, even though Plaintiff has two children and two stepchildren;

q.      The date Plaintiff requested on the vacation calendar was erased, and another employee took the date, requiring Plaintiff to work an extra weekend; and

r.      An employee allegedly used the term "mammy."

Defendants respond that the majority of these complaints cannot be considered race-based, and therefore cannot constitute actionable, race-based harassment as a matter of law under Title VII. Further, Defendants argue that the complained-of conduct cannot be considered severe or pervasive to a reasonable person because it occurred sporadically over a six-year time period.  In reviewing these instances of alleged harassment, it is clear that the majority of these allegations, while certainly rude or impolite, in no way implicate Title VII.

The requirement that Plaintiff demonstrate that the actions of the Defendants altered the conditions of the workplace, creating an objectively and subjectively abusive and hostile

atmosphere, is designed to be "sufficiently demanding to ensure that Title VII does not become a 'general civility code." ' <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (quoting <u>Oncale v. Sundowner Offshore Serv., Inc</u>., 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)).  While Plaintiff might have been offended when she was not invited to a housewarming party, or when coworkers did not eat her food, this does not satisfy the "severe or pervasive" requirement for a hostile work environment claim.  Nor does this qualify as harassment based on Plaintiff's race.  Plaintiff has, however, alleged several other incidents that would qualify as severe race-based harassment.

In one instance, Plaintiff states that when she returned to work on January 2002, she found a folded piece of paper lying on the floor, near the entryway of the facility.  When she picked it up and read it, Plaintiff saw that the paper was entitled "Why Blacks Are Inferior." Plaintiff admits that she does not know who left the paper on the floor, that it was located where patients and relatives sit, and that it was purely coincidental that she picked up the paper. Plaintiff also says that she overheard other employees use the word "nigger," although not in reference to her.  Doc. 42, Ex. E part 4 at 208-209.  Beginning in October 2001, two or three patients, however, are alleged to have called Plaintiff "nigger" directly.  Plaintiff alleges that a fellow PCT, Melissa Turenne, would use that slur in reference to Plaintiff when speaking to other patients and employees, who would then inform Plaintiff about the statement.  <u>Id</u>. at 209. Finally, Plaintiff states that co-worker Melissa Turenne used the term "mammy" in a conversation with her.  Doc. 42, Ex. E part 4 at 282-83.

The overt racial claims alleged by Plaintiff would be that patients directed racial slurs at her, that employees used racial slurs in talking about her, and that she found by accident a piece

of paper with racist remarks.  While reasonable person would certainly find these events to be

offensive, the burden is on Plaintiff to show the workplace was permeated with racially

discriminatory intimidation, ridicule, and insult.  Although Plaintiff alleges that she was

subjected to racial harassment during the her entire employment with Fersenius, the specific

instances of conduct Plaintiff alleges to support her claim all occurred in 2001.  These alleged

incidents regarding patients, under the totality of the circumstances, would allow a reasonable

jury to conclude that severe ridicule and insult based on Plaintiff's race unreasonably interfered

with Plaintiff's job performance and created an abusive working environment.  Since none of

these incidents is alleged to have been caused by the employer, rather, Defendants' liability is

predicated on their failure to correct or prevent these actions, it is necessary to consider if

Plaintiff has established the final element of the prima facie case–whether Defendants can be

held liable for the actions of their patients and employees.

*Defendants' Liability for Hostile Work Environment*

In order to establish a prima facie case for hostile work environment, Plaintiff must not

only show that severe or pervasive discrimination created an abusive working environment, but

also that Defendants are vicariously or directly liability for such environment.  The Supreme

Court has drawn a distinction between employer liability for harassment by supervisors and

harassment by coworkers:

> When a person with supervisory authority discriminates in the terms and conditions of
> subordinates' employment, his actions necessarily draw upon his superior position over
> the people who report to him, or those under them, whereas an employee generally
> cannot check a supervisor's abusive conduct the same way that she might deal with abuse
> from a co-worker. When a fellow employee harasses, the victim can walk away or tell the
> offender where to go . . . .

Faragher, 524 U.S. at 803, 118 S.Ct. at 2291.  The Court then held that "[a]n employer is subject

to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." Id. at 806.  In this situation, if the supervisor was aided by the agency relationship, it is not necessary that those at the highest executive levels receive actual notice before an employer is subject to liability for harassment by a supervisor.  Plaintiff, however, does not allege harassment by a supervisor, but rather Plaintiff states that harassment by co-workers and patients created a hostile environment.

For claims of harassment by non-supervisory personnel, a plaintiff must show that his or her employer knew or should have known of the harassment, and then failed to take proper action.  See Coates v. Sundor Brands, Inc., 164 F.3d 1361, 1366 (11th Cir.1999).  Because the failure to correct harassment amounts to ratification of the behavior, the employer must first have actual or constructive knowledge of the discrimination before becoming liable for the failure to remedy it.  In addition to non-supervisory personnel, Plaintiff alleges that patients at the Starke facility also created a hostile work environment based on her race.  In Watson v. Blue Circle, Inc., 324 F.3d 1252, 1258 n. 2 (11th Cir.2003), the Eleventh Circuit noted that an employer may be found liable for the harassing conduct of non-employees if the employer fails to take immediate and appropriate corrective action in response to a hostile work environment of which the employer knew or reasonably should have known.   Accordingly, Defendants can be held liable for the conduct of their patients and employees only if they failed to take action to remedy harassment that they knew or should have known about.

Whether an employee's actual or constructive knowledge of harassment will be imputed to the employer is determined by agency principles.  The Restatement (Second) of Agency recognizes two situations where an employee's actual or constructive knowledge of harassment

will be imputed to the employer.  First, knowledge will be imputed where an employee is

charged with a duty to act on the knowledge and stop the harassment.  <u>See</u> Restatement (Second)

Agency § 272 cmt. a (1958)("The liability of a principal because of the knowledge of the agent

is based upon the existence of a duty on the part of the agent to act in light of the knowledge

which he has.").  The second situation is where an employee is charged with a duty to inform the

company of the harassment.  <u>See</u> id. at § 275 ("[T]he principal is affected by the knowledge

which an agent has a duty to disclose to the principal or to another agent of the principal to the

same extent as if the principal had the information.").  In this case, the question becomes

whether any employees who had actual or constructive knowledge of any alleged harassment

also had duties to Defendants to act on this knowledge and stop the harassment, or to inform

Defendants of the harassment.

Plaintiff lists three employees of Defendants to whom she directed her complaints of

race-based harassment: Clinical Manager Dottie Witcher, Clinical Manager Kim Justus, and

Area Administrator Carol McNamara.  At the Starke facility, the level of responsibility, in

ascending order, begins at clerical staff, and rises to Reuse Technicians, PCTs, Nurses, and the

Clinical Manager.  Clinical Managers, also referred to as Directors of Nursing, are in charge of

all patient care and supervising the clinical staff.  The immediate supervisor of the Clinical

Manager is the Area Administrator, who manages budgets and reviews staff evaluations, and

who reports to the Regional Vice President.  Kim Justus worked as the Clinical Manager of the

Starke facility from 1999 until 2001, when Dottie Witcher took over as Clinical Manager.  Carol

McNamara worked as the Area Administrator in charge of the Starke facility from 1996 or 1997

until 2006.

Because Plaintiff was directed to report instances of harassment to these three employees under Defendants' grievance policy, any complaints to these employees thereby gave actual notice of the harassment to Defendants.  See Coates v. Sundor Brands, Inc., 164 F.3d 1361, 1364 (11th Cir.1999).  To establish constructive knowledge, a plaintiff must show that the harassment was pervasive enough that the employer should have known of its existence.  See Farley v. American Cast Iron Pipe Co., 115 F.3d 1548, 1553 (11th Cir.1997).  Where a company has valid, effective, and well-disseminated harassment policy that is unequivocally communicated to its employees, offering several avenues for lodging a grievance, and the company adheres to its own policies, the Eleventh Circuit has concluded that an employer cannot be charged with constructive knowledge of alleged instances of harassment.  Id.  With this in mind, the Court will consider whether Plaintiff has shown that Defendants had actual or constructive knowledge of any racial harassment by co-workers and patients, or whether Defendants established and adhered to a valid and effective harassment policy to preclude a finding of constructive knowledge of the harassment.

### 1.  Clinical Manager Kim Justus

When asked if she had ever personally heard any racial remarks made about Plaintiff or slurs directed at Plaintiff, Clinical Manager Kim Justus responds in her affidavit that she had not. Ms. Justus did, however, admit to having heard of patients treating Plaintiff in a degrading manner because of her race.  Specifically, Kim Justus states that she was told by employees that an elderly patient had used the word "nigger" either about Plaintiff or directed at her, and that Ms. Justus confronted the patient and told him that such behavior was inappropriate and would not be tolerated.   Doc. 42, Ex. B at 23.  Although Ms. Justus states that Plaintiff had complained

to her once or twice, she did not recall Plaintiff ever complaining that she was the victim of racial discrimination or harassment.   Doc. 42, Ex. B at 63-64.

## 2.  Clinical Manager Dottie Witcher

Dottie Witcher states that as Clinical Manager of the Starke facility, Plaintiff did not complain to her about any racial issues relating to staff members, but that Plaintiff did complain to her about racial issues concerning three patients.  Doc. 42, Ex. G at 11.  Ms. Witcher recounts only one instance, shortly after she began working at the Starke facility in 2001, in which Plaintiff complained to her about racial issues with patients.  According to her affidavit, Dottie Witcher remembers Plaintiff's complaint as related to patients calling her names and refusing to let her treat them or to canulate them.  Doc. 42, Ex. E at 72-73.  In response, the charge nurse was instructed to speak with the particular patient to convince him to allow Plaintiff to canulate him, to which Plaintiff states the patient said, "I don't want her sticking me.  Ain't no nigger going to stick me." Id.

Ms. Witcher discussed this issue with Area Administrator Carol McNamara.  Although Dottie Witcher states that she and Plaintiff did talk about patient issues several times, Plaintiff "never came and complained after I told her that I would take care of some of the racial issues that she was telling me about."  Id.  In response to Plaintiff's complaints, Plaintiff was reassigned to different patients, and was permitted to work on the side of the floor opposite from the patient who was causing problems.  Because one of the patients transferred to another facility, another patient had died, and Plaintiff had no contact with the remaining patient, Ms. Witcher states that she believed the problem had been resolved.

### 3.  Area Administrator Carol McNamara

In her affidavit, Carol McNamara, Area Administrator for Defendants, states that she did become aware of one instance of Plaintiff alleging that she was being discriminated against on the basis of her race.  This incident in December 2001, where an elderly patient called Plaintiff "nigger" and refused to allow her to treat him, occurred immediately prior to Plaintiff's medical leave.  Carol McNamara states that Defendants instituted several remedial measures in response to this event, such as posting Defendants' anti-discrimination policy, talking with the patient in question, and assigning Plaintiff to a different patient.  In addition to this complaint, Plaintiff says that in June 2001 she complained to Carol McNamara about the use of the term "nigger" and the use of the term "mammy" by Melissa Turenne, and about the conduct of other patients toward her.  Doc. 42, Ex. E part 4 at 279-83.

Ms. McNamara also recounts the incident in January 2002, where Plaintiff found a folded piece of paper lying on the floor in the patient waiting room, entitled "Why Blacks Are Inferior." Doc. 42, Ex. H at 26.  Plaintiff brought this paper to Clinical Manager Dottie Witcher, who then gave it to Carol McNamara.  After discussing this issue with Dottie Witcher, Carol McNamara states that the matter was investigated, and that Defendants' policy against racial discrimination was posted in the patient waiting room.

Taken as a whole, these statements reflect that Defendants were certainly aware that Plaintiff was being harassed on the basis of her race by at least one patient.  Nevertheless, if an employer has actual or constructive notice of harassment, but takes immediate and appropriate corrective action, the employer is not liable for the harassment.  See Watson v. Blue Circle, Inc., 324 F.3d 1252, 1258 (11th Cir.2003).  In this case, Kim Justus confronted the patient and told

him that such behavior was inappropriate and would not be tolerated, Dottie Witcher reassigned

Plaintiff to different patients and away from the harassing patient, and Carol McNamara states

that she instituted an investigation into the racist paper and posted Defendants' anti-

discrimination policy in the patient waiting room.

Defendants state that their policy in addressing discrimination and harassment by patients

is first to admonish patients who make inappropriate comments, then to place them on a

behavioral plan if their conduct does not improve, and, finally, to remove the patient from the

clinic if the conduct continues.  Doc. 42, Ex. F at 4.  In redressing the instant patient harassment,

Defendants had instituted the first two steps of their policy.  Because many end-stage renal

patients are often elderly, and suffer from dementia and other emotional or mental conditions,

Defendants state that addressing complaints of discrimination and harassment often involves

negotiating between the rights of patients to dialysis treatment, the availability of alternative

resources for placement, and the rights of the other party affected by the questionable behavior.

Id.  Considering this, Plaintiff has not shown that Defendants failed to take immediate and

appropriate corrective action in response Plaintiff's complaint about a race-based harassment by

patients.  Therefore, while Plaintiff may be able to show that Defendants knew of patients

harassing her, she cannot establish that Defendants failed to take action to remedy the situation.

Likewise, Plaintiff has failed to show that Defendants had actual or constructive

knowledge of the race-based harassment by non-supervisory personnel.  Plaintiff herself admits

that her claim of race-based hostile work environment is based chiefly on the conduct of a few

patients.  "Like I said, mainly the racial things were those of the patients. . . .  those few patients.

It wasn't all of them.  It's those few that made it very difficult to work on the floor."  Doc. 42,

Ex. E part 2 at 103.  The substance of Plaintiffs allegations regarding harassment by co-workers

is that fellow PCT Melissa Turenne stated that she and Plaintiff both had "mammies," and

referred to another co-worker as "acting like a nigger." Doc. 42, Ex. E part 4 at 279, 281.

Plaintiff states that she complained to Carol McNamara "about Melissa being able to say

whatever comes out of her mouth.  You know, I even told Carol about her talking about

mammies." Id.  In describing her complaint about Melissa Turenne, Plaintiff states that she told

Carol McNamara and Kim Justus that "[Melissa] keeps doing things that are very irritating, and

she does these things on purpose.  She wouldn't help me get things straightened on the floor.

She won't help me when I need to put a patient in the chair." Doc. 42, Ex. G part 2 at 98.

When asked if she ever complained to Carol McNamara about feeling victimized on the basis of

her race because of the conduct of her co-workers, Plaintiff said she did not.  Doc. 42, Ex. E part

4 at 279.

　　　While Plaintiff certainly complained about the professionalism of her co-workers, the

record reflects that Defendants were not put on actual notice that non-supervisory personnel

were harassing Plaintiff on account of her race.  Also, irrespective of any valid and effective

policy, any alleged harassment was not pervasive enough so that the Defendants should have

known of its existence.  Therefore, because Plaintiff cannot establish Defendants' liability under

Title VII, Plaintiff has failed to establish a prima facie case of race-based hostile work

environment.

<em>Defendants' Affirmative Defense Under <u>Faragher/Ellerth</u></em>

　　　Even if Plaintiff could establish a prima facie case of hostile work environment,

Defendants' are shielded by the safe harbor established under the <u>Faragher/Ellerth</u> affirmative

defense, and therefore are entitled to summary judgment.  It is an affirmative defense under

Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998),

that (1) an employer exercised reasonable care to prevent and promptly correct any harassing

behavior; and (2) a plaintiff unreasonably failed to take advantage of the preventive or corrective

opportunities provided by the employer.   An employer may assert this affirmative defense only

"[w]hen no tangible employment action is taken."  Faragher, 524 U.S.at 807-08.  The first step in

a Faragher/Ellerth analysis is deciding whether the employer has exercised reasonable care in

preventing harassing behavior.  Next, a court inquires into whether the employee made

reasonably sufficient use of available avenues to put the employer on notice of the problem.

Finally, a court determines whether the employer or its authorized agent, after receiving notice of

the harassment, took adequate steps to abate and prevent the recurrence of harassment.  See

Coates v. Sundor Brands, Inc., 164 F.3d 1361, 1369 (11th Cir.1999)(Barkett, C.J., concurring).

Defendants state that they maintain anti-discrimination, anti-harassment, and grievance

policies and procedures that outline the manner in which an employee may complain about

inappropriate behaviors, as well as a toll-free Employee Action Line where employees may

anonymously report discriminatory or harassing conduct.  The policies and toll-free number are

located in the Employee Handbook and posted in visible areas in the workplace.  Because

Defendants promulgated this anti-harassment policy, Defendants have fulfilled the first element

of the Faragher/Ellerth affirmative defense.  The next step in the analysis is whether Plaintiff

unreasonably failed to take advantage of the preventive or corrective opportunities provided by

the employer, and whether Defendants promptly remedied any harassing behavior when they

became aware of it.

Defendants' Employee Handbook directs employees who feel that they are being harassed to either follow the Problem Resolution procedure outlined in the Handbook and the Human Resource Policy Manual, or to call the Employee Action Line.  Doc. 42, Ex. 2 at 14.  The Employee Action Line is described as an anonymous, toll-fee, twenty-four hour phone line for employees to ask questions, raise concerns, and "to confidentially and/or anonymously report activities that may involve violations of the *Code of Ethics and Business Conduct*."  Id. at 13.  The Employee Handbook states that the Employee Action Line is an added resource, and that direct communication between the employee and the supervisor, senior management, or other departments is encouraged.

Defendants' Grievance and Problem Resolution Procedure provides that an employee begins the grievance process by discussing the issue with their immediate supervisor immediately following the event.  Then, the employee should verbally identify the issue in complete detail within ten work days.  "After addressing the grievance verbally as a means of informal resolution, the immediate supervisor has **five (5)** days to submit in writing to the employee the resolution to the grievance."  Id. at 17.  An employee who is not satisfied with the resolution at this step, or if a conflict exists with the immediate supervisor, the grievance procedures direct the employee to submit a written grievance to the next level supervisor.  This process is repeated up each managerial level until a final resolution of the issue by the appropriate Regional Vice President, Manager, or Director.

Plaintiff admits that she received an employee handbook and that she knew of the Employee Action Line.  Doc. 42, Ex. E part 3 at 186-187.  Despite this, Plaintiff states that she did not call the Employee Action Line out of fear of retaliation, because as the only African-

American at the Starke facility, it would be readily apparent who had called.  Id. 190.  Plaintiff

claims that two patients had called the line separately about different problems, and were

retaliated against by employees because of this.  Id. 190-191.  Regardless of Plaintiff's failure to

use the Action Line, the Employee Handbook suggests this as but one way of reporting

harassment, and encourages employees to contact their immediate supervisor directly, which

Plaintiff did.  Although Plaintiff discussed the issues of patient harassment with her immediate

supervisors, few of these discussions occurred immediately following the event or identified the

issue in complete detail within ten work days, and most were related to patients refusing to let

Plaintiff treat them.  The same is true for Plaintiff's complaints about harassment by co-workers,

which described other employees not assisting Plaintiff and one employee "being able to say

whatever comes out of her mouth."

These complaints did not fully inform the managers of the existence or extent of the

harassment, and Plaintiff acted unreasonably in putting her employer on notice of the problem.

Once Plaintiff provided Defendants with notice of the racial harassment, Defendants promptly

instituted measures to prevent and correct any harassing behavior.  Therefore, Defendants have

satisfied the second prong of the Faragher/Ellerth affirmative defense with regard to their

vicarious liability, and are entitled to summary judgment on this count.

## C. Racial Discrimination - Disparate Pay

Plaintiff also alleges that she was discriminated against on account of her race in

violation of Title VII because she was paid less than white co-workers who performed similar

jobs.  To state a prima facie case of intentional discrimination in compensation, a plaintiff must

establish that (1) she belongs to a racial minority; (2) she received low wages; (3) similarly

situated comparators outside the protected class received higher compensation; and (4) she was

qualified to receive the higher wage.  Cooper v. Southern Co., 390 F.3d 695, 734-35 (11th Cir.

2004).  The comparators must perform jobs similar to a plaintiff's; thus, Plaintiff must show that,

in her job, she "shared the same type of tasks" as the comparators.  See Miranda v. B&B Cash

Grocery Store, Inc., 975 F.2d 1518, 1528 (11th Cir.1992).

When Plaintiff was hired on February 6, 1996, her pay rate was $7.05 per hour, based

upon her one-and-a-half years experience as a Certified Nursing Assistant.  At the time of her

resignation, Plaintiff was the second-most senior PCT at Defendants' Starke facility, and her pay

rate was $9.94 per hour.  Plaintiff points to the following comparators as evidence of racial

discrimination through disparate pay:

- a.  Dana McMillan was hired as a PCT four-and-a-half years after Plaintiff at a pay rate of $6.75 per hour, based on her four months experience as a respiratory technician.
- b.  Michael Bowen was hired as a PCT three years after Plaintiff with prior experience as a Reuse Technician, and earned $9.97 per hour at the time of Plaintiff's resignation.
- c.  Becky Norman was hired at the same as Plaintiff at the pay rate of $8.30 per hour, based upon ten years of experience in phlebotomy, and was earning $12.26 per hour at the time of Plaintiff's departure.
- d.  Stephanie Wilkerson was hired nearly six years after Plaintiff at the pay rate of $9.12 per hour, based upon two years of experience in phlebotomy.
- e.  Ron Rutkiewicz was hired in September of 2002, after Plaintiff had resigned, at the pay rate of $8.21, based on his over five years of experience in phlebotomy.

In addition to Plaintiff's claims that the rates of pay were different, she also claims that she was

given disparate increases in pay compared to white co-workers.  Over her six years of

employment, Plaintiff's salary increased a total of $2.89 an hour.  This amounted to an average

yearly increase in pay of $.48 an hour.  Plaintiff then compares this to Becky Norman's salary,

which increased a total of $3.96 an hour over the same amount of time, averaging a yearly pay

increase of $.66 an hour.  Over six years, then, Beck Norman's pay rate increased a total of $1.07 more than Plaintiff's increase.

In their Motion for Summary Judgment, Defendants argue that Plaintiff has failed to establish a prima facie case of disparate pay.  Defendants state that hourly rates for PCTs are based upon experience, years of service, performance, merit increases, and periodic market adjustments.  When Plaintiff was hired, the pay scale for PCTs ranged between a minimum of $6.81 per hour and a maximum of $9.53 per hour.  Therefore, Plaintiff's starting pay of $7.05 per hour was $0.24 higher than the minimum hourly rate.  Defendants allege that Plaintiff received close to the maximum merit increase given for each year of her employment.  Further, Defendants state that at the time of her resignation, Plaintiff was the third highest paid PCT, out of fourteen total PCTs.

Defendants also proffer a race-neutral reason for any disparity in pay.  Because of the annual market adjustments to the pay rate, Defendants claim that newer employees start at higher rates of pay than those received by current employees.  The range of pay is then determined between a minimum and maximum based on prior experience, educational background, certifications, and other relevant experience.  According to Carol McNamara, who was the Area Administrator overseeing the Starke facility at the time of Plaintiff's employment, the initial rate of pay for employees is determined through an Equity Analysis Form, which lists such factors as experience, length of employment with Defendants, and current pay rate.  Doc. 42, Ex. H at 23.  This form is then sent to the Defendants' corporate office, where the human resources department provides a range from which the administrator or manager would select the pay rate.

The two employees who were paid more than Plaintiff at the time of her resignation,

Becky Norman and Michael Bowen, either had significantly more experience or had commenced

their employment at a higher start rate of pay.  Becky Norman had ten years of experience in

phlebotomy, and was rated as one of the best PCTs.  <u>See</u> Doc. 42, Ex. B at 31("Becky was a

much better P.C.T. [than Plaintiff]").  By comparison, Plaintiff had one and a half years

experience as a Certified Nursing Assistant, and was rated as an average to above-average PCT.

<u>See</u> Doc. 42, Ex. G at 22, Ex. F at 2 ("[Plaintiff's] performance as a PCT was average in

comparison to other PCTs.").  Michael Bowen was hired as a PCT in 2000, when the start rate

for PCTs was significantly higher than in 1996, after having worked for Defendants as a Reuse

Technician.

    In reviewing the attached pay schedule, out of fourteen PCTs, the average pay rate in

2002 was $9.31 per hour.  Except for the three PCTs earning $7.41, $7.50, and $12.26 per hour,

every other PCT earned between $9.12 to $9.97 per hour–eight out the eleven of which earned

less than $9.40 per hour.  Therefore, Plaintiff cannot establish a prima facie case that similarly

situated comparators outside the protected class received higher compensation.  Moreover, as the

third-highest paid PCT, Plaintiff cannot show that she received low wages on account of her

race.  Accordingly, Plaintiff has failed to establish a prima facie case under Title VII of racial

discrimination based on disparity in pay.

    In addition, Defendants have shown that any difference in pay is the result of valid, race-

neutral reasons, and Plaintiff has failed to establish that these reasons are pretextual.  Hourly pay

rates are determined by Defendants' human resource department based on experience, years of

service, performance, merit increases, and periodic market adjustments.  Becky Norman, who

had the most experience and was highly-rated, received the highest pay rate.  Stephanie

Wilkerson was hired six years after Plaintiff and earned the minimum hourly rate.  Dana

McMillan, who had less experience than Plaintiff, also earned less than Plaintiff.  Michael

Bowen was hired several years after Plaintiff, had previously worked for Defendants, and had

experience as a Reuse Technician.  Taken together, these employees demonstrate that

Defendants' proffered race-neutral reasons are not pretextual or applied in a discriminatory

manner.

### D. Racial Discrimination - Constructive Discharge

In her complaint, Plaintiff alleges that she was constructively discharged from her

employment due to the hostile and abusive work environment.  Plaintiff resigned from her

employment, and employee resignations are presumed to be voluntary.  However, a resignation

is deemed involuntary where the employer forces an employee to resign through coercion or

duress.  If an "employer deliberately makes an employee's working condition so intolerable that

the employee is forced into an involuntary resignation, then the employer has encompassed a

constructive discharge and is as liable for any illegal conduct involved therein as if it had

formally discharged the aggrieved employee."  Buckley v. Hospital Corp. of America, Inc., 758

F.2d 1525, 1530 (11th Cir.1985)(quoting Young v. Southwestern Savings & Loan Association,

509 F.2d 140, 144 (5th Cir.1975)).

To make a claim of constructive discharge, an employee must show that working

conditions were so difficult or unreasonable as to compel a reasonable person to resign.  Hill v.

Winn-Dixie Stores, Inc., 934 F.2d 1518, 1527 (11th Cir.1991).  An employee has the duty to act

reasonably before choosing to resign, and part of an employee's obligation to be reasonable is to

first notify the employer of the intolerable conditions, and then afford the employer an

opportunity to correct them.  See Garner v. Wal-Mart Stores, Inc., 807 F.2d 1536, 1539 (11th Cir.1987).  In order to find a constructive discharge, a plaintiff must show a high degree of deterioration in their working conditions, approaching the level of "intolerable."  Wardwell v. School Bd. of Palm Beach County, Florida, 786 F.2d 1554, 1559 (11th Cir.1986)(holding that an employer's failure to promote and consequent embarrassment to employee, together with employee's added workload, "simply do not rise to the intolerable level at which a reasonable person would feel compelled to resign.").  While Plaintiff may have felt embarrassed when patients insulted her for making mistakes, or when patients and employees used racial slurs, for the reasons previously stated, Plaintiff was not reasonable in informing Defendants about the nature and extent of the harassment or the deterioration of the working conditions.

Moreover, Defendants attempted to correct any racial harassment, and Plaintiff was unreasonable in failing to afford Defendants an opportunity to correct the harassment.  When informed of the problems Plaintiff was having with certain patients, Defendants instituted an escalating response–first speaking with the patient and informing them of the inappropriateness of the behavior, and when that was not effective, Defendants assigned Plaintiff to different patients and limited her contact with the problematic patient.  This response was not the behavior of an employer deliberately attempting to force Plaintiff into resigning by creating an intolerable working condition.  Because Plaintiff cannot establish a prima facie case of constructive discharge, there is no existence of a genuine issue of material fact, and summary judgment must be granted on this count.

### III.  Conclusion

After considering Defendants' Motion for Summary Judgment, Doc. 42, and Plaintiff's

Amended Response in Opposition, Doc. 51, the Court finds that summary judgment must be granted on all counts.  The Court is mindful of the serious allegations raised by Plaintiff, and it is clear from the record that Plaintiff worked in an environment that was difficult and challenging.  While the record shows that Plaintiff complained of these difficulties, it also shows that Defendants attempted to rectify the situation once Plaintiff fully informed them of the race-based nature of the problems.  Plaintiff herself testified that she had no further issues with patients or employees after Defendants instituted remedial actions.  Because these remedial actions were reasonable and effective, Plaintiff cannot establish Defendants' liability as a matter of law.

Accordingly, it is hereby

**ORDERED AND ADJUDGED:**

1.      Defendants' Motion to Strike, Doc. 50, is granted, and Plaintiff's Response on Opposition, Doc. 48, is stricken.

2.      Defendants' Motion for Summary Judgment, Doc. 42, is granted, and this case is dismissed.

3.      The Court reserves jurisdiction to consider and award fees and costs, as may be appropriate, upon a timely filed motion.

**DONE AND ORDERED** this _  17th_ day of May, 2007

_        s/Maurice M. Paul_
Maurice M. Paul, Senior District Judge